# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DEIRDRE JO MCCOY, | ) | |
| | ) | Case No. 15-70395-SCS |
| *Debtor.* | ) | |
| | ) | |
| ESTATE OF ERMA C. MCCOY, | ) | |
| | ) | APN 15-07042-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEIRDRE JO MCCOY, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial on February 17, 2016, upon the Complaint of the Estate of Erma C. McCoy (the "Plaintiff") against Deirdre Jo McCoy (the "Debtor"). The Complaint ("Complaint"), filed May 11, 2015, seeks a determination that an indebtedness owed to the Plaintiff by the Debtor is not dischargeable pursuant to 11 U.S.C. § 523(a). At the conclusion of the trial, the Court took the matter under advisement. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This Memorandum Opinion constitutes the findings of fact and conclusions of law of this Court pursuant to Federal Rule of Civil Procedure 52, incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

## I. The Complaint

The Complaint alleges that the Debtor engaged in a series of fraudulent acts that ultimately resulted in Erma C. McCoy (hereinafter, "Mrs. McCoy") obtaining a reverse mortgage to satisfy certain debts incurred by the Debtor. The Plaintiff further alleges that the Debtor committed fraud by misrepresenting her intent to pay a promissory note (hereinafter, the "Confessed Judgment Note") that she entered into with Mrs. McCoy (who is now deceased and whose interest is represented by the Plaintiff), the purpose of which was to repay Mrs. McCoy for satisfying her (the Debtor's) debts. The Debtor admits signing the Confessed Judgment Note but denies the allegations of fraudulent behavior. The Complaint seeks to deny the Debtor's discharge with regard to this debt pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).

## II. Findings of Fact

A large portion of the factual history was uncontested. Moreover, all of the exhibits tendered by the Plaintiff and the Debtor were admitted without objection. Transcript of February 17, 2016 Trial (hereinafter, "Tr.") at 3.

The parties agree that Mrs. McCoy, a widow, was a strong woman with a limited education from a modest background who monitored her finances zealously. *Id.* at 6, 12-13. It is also undisputed that Mrs. McCoy deeded the house she resided in for a number of years, located at 333 Southgate Avenue, Virginia Beach, Virginia (hereinafter, the "Southgate Property") to her son, John Lee McCoy, Jr. (hereinafter, "John McCoy")[1] and his wife, the Debtor, around 2002.[2]

---

[1] Both parties also referred to John McCoy as "Uncle Bill" throughout the trial. Similarly, Mrs. McCoy was referred to as "Miss Erma" throughout the testimony.

[2] The Debtor represented that Mrs. McCoy gifted the Southgate Property to her and John McCoy because they had been paying the mortgage on the property since 1995. Tr. at 89, 104-05. Counsel for the Plaintiff insinuated in her cross-examination of the Debtor, however, that John McCoy and the Debtor forced Mrs. McCoy to gift the Southgate Property to them, which the Debtor fervently denied. *Id*. at 140.

Compl. ¶ 4; Answer ¶ 4; Tr. at 19, 89, 116; Def.'s Ex. E, Deed of Gift transferring ownership of

the Southgate Property from Erma C. McCoy to John McCoy and the Debtor dated October 1,

2002. The Debtor and John McCoy then encumbered the Southgate Property with a substantial

amount of debt. Compl. ¶ 4; *see* Tr. at 18-21, 104, 106, 108, 117. However, the parties diverge

on their assessments of the purpose, nature, and amount of additional debt that allegedly

encumbered the Southgate Property.

The Plaintiff called Natalia Wilson (hereinafter, "Ms. Wilson"), Mrs. McCoy's

granddaughter, to testify during the trial. Tr. at 4. Mrs. McCoy and Ms. Wilson had a close

relationship during Mrs. McCoy's lifetime. *See id*. at 9-10. After Ms. Wilson became an attorney

---

Throughout the trial, the Debtor asserted that Mrs. McCoy had encumbered the Southgate Property with a mortgage prior to transferring the property. The Debtor's exhibits support her testimony that the transfer of the property to her and John McCoy was subject to an existing lien. *See id*. at 89, 108, 115-17, 136, 141-42; Def.'s Ex. A, $50,000.00 Promissory Note to the Commonwealth of Virginia made by Erma C. McCoy dated August 13, 1987 and accompanying Deed of Trust (encumbering the Southgate Property); Def.'s Ex. B, December 12, 1996 Letter to the General District Court for the City of Virginia Beach, Virginia and Notice of Motion for Judgment for Default on Promissory Note dated October 15, 1996; Def.'s Ex. C, Deed of Trust for Southgate Property dated February 2, 1996 (demonstrating that Mrs. McCoy entered into a note secured by the Southgate Property on February 2, 1996, with Resource Mortgage, Inc., in the principal amount of $47,000.00); Def.'s Ex. D, Letters from Erma C. McCoy to Resource Mortgage, Inc., dated December 18, 1995, and December 21, 1995 (related to Mrs. McCoy's refinancing efforts); Def.'s Ex. E, Deed of Gift transferring ownership of the Southgate Property from Erma C. McCoy to John McCoy and the Debtor dated October 1, 2002 (referencing an existing lien on the property in the principal sum of $47,000.00); Def.'s Ex. Q, Letter from Erma C. McCoy to Principal Residential Mortgage dated July 20, 2000 (authorizing John McCoy to handle matters related to Mrs. McCoy's mortgage); Pl.'s Ex. 27, Debtor's Responses to Plaintiff's First Set of Interrogatories (Responses to Interrogatories 6 and 8) (discussing John McCoy handling matters related to and paying Mrs. McCoy's mortgage since 1995).

The Court notes that Mrs. McCoy encumbered the Southgate Property with multiple liens at different times, as Defendant's Exhibit A references a lien that was taken out to secure a bond in 1987 owed to the City of Norfolk, Virginia, whereas Defendant's Exhibit C references a traditional mortgage transaction in 1996. While there is some dispute amongst the parties regarding whether there were any pre-existing liens when the Southgate Property was transferred to John McCoy and the Debtor, the exhibits show that the Southgate Property transfer was subject to the pre-existing lien held by Resource Mortgage. *See* Def.'s Ex. E.

in 2006, Mrs. McCoy forwarded her mail and financial information for Ms. Wilson to review.[3]

*Id.* at 10-11. Ms. Wilson qualified and continues to serve as the executrix of Mrs. McCoy's

estate. Compl. ¶ 22; Tr. at 5; Pl.'s Ex. 23, Certificate of Qualification of Natalia C. Wilson as

Executrix of the Estate of Erma McCoy dated March 9, 2015.

Ms. Wilson learned from documents that the Debtor provided during discovery that in

2002, John McCoy and the Debtor agreed to use the Southgate Property as collateral to secure a

loan to allow them to repay a $54,290.00 debt related to their flooring business owed to

Dominion Management (hereinafter, "Dominion"). *See* Tr. at 19-21; Pl.'s Ex. 4, Dominion

Demand Note and Acknowledgment of Debt dated October 30, 2002 (hereinafter, the "Dominion

Demand Note" and "Acknowledgment of Debt").[4] The Acknowledgment of Debt set forth that

John McCoy and the Debtor would "activate an equity loan from SunTrust Bank in the amount

of $39,000.00 to be paid to [Dominion] on November 6th, 2002 to partially satisfy a personal

debt of $54,290.00" and that the Debtor and John McCoy "agree to pay [Dominion] $550.00 per

month for 29 months to satisfy the remainder of the personal debt of $15,290.00." Pl.'s Ex. 4,

Acknowledgment of Debt.

---

[3] Ms. Wilson testified that she does not have a great deal of knowledge regarding Mrs. McCoy's
financial affairs and interactions with the Debtor and John McCoy before 2006. *See* Tr. at 93.

[4] Plaintiff's Exhibit 4 includes the Dominion Demand Note, the Acknowledgment of Debt, a
statement for the "McCoy Account" dated October 2, 2002, and a copy of Dominion
Management's Accounts Receivable dated September 28, 2005, apparently related to
Dominion's transactions with John McCoy and the Debtor. Defendant's Exhibit L also contains
the Dominion Demand Note, the Acknowledgement of Debt, and a statement for the "McCoy
Account" dated October 2, 2002. Although Ms. Wilson testified that the Southgate Property was
used to secure the Dominion Loan (Tr. at 20), the Dominion Demand Note and Acknowledgment
of Debt do not explicitly state that the Southgate Property was to be used as collateral to secure
the loan. The Court notes that attachment referenced in the second paragraph of the
Dominion Demand Note regarding a property description is missing from both the Plaintiff's
Exhibit 4 and the Defendant's Exhibit L.

It is undisputed that the Debtor and John McCoy applied for an equity loan from SunTrust Bank in October 2002, using the Southgate Property as collateral. Pl.'s Ex. 3, SunTrust Equity Application dated October 22, 2002; *see also* Tr. at 19, 103-04.[5] While neither party offered into evidence any note or deed of trust resulting from the application to SunTrust for an equity loan, the Southgate Property was apparently encumbered with a mortgage on November 18, 2002 (hereinafter, the "SunTrust Loan"). Compl. ¶ 4; Tr. at 19, 67, 104; Pl.'s Ex. 5, SunTrust Certificate of Transfer of Deed of Trust to CitiCorp dated November 18, 2002.[6] Ms. Wilson testified she believed that the Debtor and John McCoy used the proceeds of the SunTrust Loan for the down payment on the purchase of their home located at 2417 Hillcrest Meadows Lane, Virginia Beach, Virginia in 2003 (the "Hillcrest Property"). *See* Tr. at 25-27; Pl.'s Ex. 6, Residential Purchase Agreement for Hillcrest Property dated April 12, 2002.[7]

---

[5] Ms. Wilson testified that the Debtor and John McCoy applied for an equity loan in the amount of $50,000.00. Tr. at 19. The Debtor testified that she and John McCoy received $39,000.00 from the SunTrust equity loan, which they subsequently paid to Dominion. *See id*. at 131. The Debtor also tendered Defendant's Exhibit F to the Court, a customer copy of a check for $39,563.84 from SunTrust, dated November 20, 2002, as "proof that we only got $39,563.94 from SunTrust." *Id*. at 142. However, the amount that the Debtor and John McCoy received from SunTrust does not clearly appear on any other exhibits tendered to the Court from either the Plaintiff or the Debtor, and thus, the Court remains uncertain of the amount of cash that the Debtor and John McCoy received from SunTrust.

[6] Plaintiff's Exhibit 5 is a certificate of transfer to CitiCorp of the deed of trust that the Debtor and John McCoy originally gave to SunTrust Bank securing the repayment of $84,585.50. Although the SunTrust Loan was transferred to CitiCorp, the Court will refer to this transaction as the SunTrust Loan to conform to the parties' references throughout the testimony.

[7] Plaintiff's Exhibit 6 includes the Residential Purchase Agreement for the Hillcrest Property dated April 12, 2002; the Addendum to the Residential Purchase Agreement for the Hillcrest Property dated April 19, 2002; the Deed of Trust for the Hillcrest Property dated November 5, 2002 (signed by both John McCoy and the Debtor but with the acknowledgment that the Debtor was signing without obligation on the accompanying note); and the Adjustable Rate Note for the Hillcrest Property dated November 5, 2002 (signed by John McCoy only). Ms. Wilson testified that the Debtor and John McCoy purchased the Hillcrest Property in 2003 (Tr. at 25), but the Residential Purchase Agreement contains a settlement date of October 29, 2002.

The Debtor admitted to executing the Dominion Demand Note (Tr. at 106) but disputed the amount of debt incurred against the Southgate Property as well as the purpose of the debt. *See id.* at 108, 142. The Debtor contended that the SunTrust Loan was not taken out to buy the Hillcrest Property, but rather to assist the business that she and John McCoy operated. *Id.* at 104, 131-32. Similarly, the Debtor disputed that the Dominion Demand Note and the SunTrust Loan were separate debts, contrary to the Plaintiff's insinuations.[8] *Id.* at 105-06, 108. Instead, the Debtor testified that she and John McCoy used the entirety of the proceeds from the SunTrust Loan ($39,563.84) to partially satisfy the Dominion Demand Note. *Id.* at 131, 142; Def.'s Ex. F, Customer Copy of Check from SunTrust dated November 20, 2002. The relevant exhibits support the Debtor's testimony. The Dominion Demand Note refers to a debt in the principal sum of $54,290.00, with interest accruing at 8.5%, owed by John McCoy and the Debtor. Pl.'s Ex. 4. Additionally, the Acknowledgment of Debt refers to a total debt of $54,290.00 and expressly states that John McCoy and the Debtor would obtain an equity loan from SunTrust Bank in the amount of $39,000.00 and pay that amount by November 6, 2002, to partially satisfy the debt owed to Dominion. *Id.*

John McCoy died in 2005, predeceasing Mrs. McCoy. Compl. ¶ 5 n.1. As the sole beneficiary of John McCoy's life insurance policy, the Debtor received approximately $204,000.00 after his death. Tr. at 27-28, 70-71, 122; Pl.'s Ex. 8, Asset Account Confirmation Certificate.[9] However, the Debtor did not use the life insurance proceeds to satisfy the

---

[8] According to the Debtor, the SunTrust Loan represented her, John McCoy, and Mrs. McCoy's combined debt. Tr. at 117.

[9] Plaintiff's Exhibit 8 is an Asset Account Confirmation Certificate from Fidelity and Guaranty Life Insurance Company (hereinafter, the "Life Insurance Account"). The document includes a statement of benefits, dated October 27, 2005, showing that the proceeds the Debtor received from her husband's life insurance policy initially totaled $204,421.20. The exhibit also includes several account statements dated between 2005 and 2007, showing funds disbursed from the Life

outstanding financial debt against the Southgate Property. Compl. ¶ 5 n.1; Tr. at 71, 122-24. Instead, after the death of her husband, the Debtor voluntarily ceased her employment, and the life insurance proceeds served as her sole source of income for three years. Tr. at 59, 71, 125-26; Pl.'s Ex. 24, Debtor's Resumé. The Debtor offered no testimony to refute Ms. Wilson's statements that she bought a new car and traveled during this time period. *See* Tr. at 73.

By September 2006, the Debtor had defaulted on the Dominion debt. *Id*. at 106-07. As a result, Dominion sought a judgment in the amount of $45,000.00 against the Debtor, which judgment was obtained by default on September 28, 2006 (hereinafter, the "Dominion Judgment"). *Id*. at 30-31; Pl.'s Ex. 11 (Dominion Judgment, Attachment 1 to Exhibit 11).[10] The Dominion Judgment created a judicial lien against the Debtor's interest in real property, thus resulting in a judicial lien being placed on both the Southgate Property and the Hillcrest Property. *See* Tr. at 32, 119; Pl.'s Ex. 11 (Dominion Judgment).[11] According to the Debtor's

---

Insurance Account, as well as a letter from the Debtor to Fidelity and Guaranty Life Insurance Company dated January 16, 2008, requesting to withdraw the remaining funds in the account. *See also* Tr. at 124.

[10] Plaintiff's Exhibit 11 is the summons and complaint filed against Mrs. McCoy by Dominion, explained in more detail, *infra*, after the Debtor failed to satisfy the default judgment entered against her by the Circuit Court of the City of Virginia Beach, Virginia. Attached to the summons and complaint against Mrs. McCoy is a copy of the judgment that Dominion had earlier obtained from the Circuit Court of the City of Virginia Beach against the Debtor in the amount of $45,000.00 plus interest at 8.5%, costs of $109.00, and attorney fees of $11,250.00. The Plaintiff tendered a copy of the judgment order only as an attachment to Exhibit 11 and not as an individual exhibit. Thus, whenever Dominion's judgment against the Debtor is cited, it will be cited as Plaintiff's Exhibit 11 (Dominion Judgment) to clarify the reference. The summons and complaint within Plaintiff's Exhibit 11 will be cited as Plaintiff's Exhibit 11 (Dominion Complaint). The Court notes that the copy of the Dominion Complaint attached to the summons is incomplete and does not contain the signature page.

[11] Dominion's judicial lien was created pursuant to Virginia Code § 8.01-458, which states that a judgment "shall be a lien on all the real estate of or to which the defendant in the judgment is or becomes possessed or entitled, from the time such judgment is recorded on the judgment lien docket . . . ." Va. Code § 8.01-458; *see also* Tr. at 32; Pl.'s Ex. 11 (Dominion Complaint).

testimony, she did not know that Dominion had placed a judicial lien against the Southgate

Property in 2006 and did not discover the lien until more than a year later. Tr. at 107, 119.

The Debtor subsequently conveyed the Southgate Property back to Mrs. McCoy by a

Deed of Gift on May 8, 2007. Compl. ¶ 6; Answer ¶ 6; Tr. at 31-32, 107; Pl.'s Ex. 9, Deed of

Gift of Southgate Property from Dierdre J. McCoy to Erma C. McCoy dated May 8, 2007.[12] The

Debtor testified that she re-deeded the Southgate Property to Mrs. McCoy because she had run

out of money to pay the expenses associated with both the Southgate Property and the Hillcrest

Property but wanted to ensure that Mrs. McCoy could continue residing in the Southgate

Property, since it had been Mrs. McCoy's home for almost fifty years.[13] Tr. at 107-08, 114.

Because the Southgate Property was already encumbered by two liens (created by the SunTrust

Loan and the Dominion Judgment) and the Debtor was facing financial hardship, she believed

there were only three available options to keep Mrs. McCoy in the Southgate Property: ask Mrs.

McCoy to pay rent to reside there, have Mrs. McCoy obtain a reverse mortgage on the property,

or allow both the Southgate and Hillcrest properties to go into foreclosure. *Id*. at 113-14. The

Debtor decided to investigate reverse mortgages because she believed a reverse mortgage was

the best option for allowing Mrs. McCoy to continue to reside in her home. *See id*. at 107-08,

114.[14]

---

[12] Ms. Wilson testified that Mrs. McCoy was confused about the Debtor's transfer of the
Southgate Property back to her, as Mrs. McCoy had been under the impression that the
Southgate Property had remained deeded in her name throughout the years. Tr. at 40-42, 80.
[13] As discussed earlier, the Debtor was not employed from October 2005 until April 2008 and
used her late husband's life insurance proceeds as her sole source of income during that time. Tr.
at 59, 71, 125-26; Pl.'s Ex. 24. The Debtor withdrew the remaining proceeds from the Life
Insurance Account on January 16, 2008. Pl.'s Ex. 8; *see* Tr. at 29, 59, 124.
[14] The Debtor's testimony indicated her expectation that ownership of the Southgate Property
would return to her after Mrs. McCoy's death and that she would become responsible for the
outstanding balance of the reverse mortgage at that time. *See* Tr. at 107-08.

The Plaintiff alleged that after the transfer of the Southgate Property back to Mrs. McCoy, the Debtor informed Mrs. McCoy that she intended to stop paying the mortgage, taxes, and insurance obligations on that property. Compl. ¶ 7; Tr. at 73. Thereafter, the Debtor scheduled a meeting for herself and Mrs. McCoy with a reverse mortgage specialist in the summer or fall of 2007. Compl. ¶ 8; *see* Tr. at 33-37, 112-13; Pl.'s Ex. 10, Reverse Mortgage Comparison from Amston Mortgage Company.[15] The Plaintiff alleged that the Debtor engaged in this conduct in an effort to have Mrs. McCoy assume all the debts John McCoy and the Debtor incurred using the Southgate Property as collateral without the benefit of any independent advice or involvement by other family members. Compl. ¶ 8; Tr. at 33-34, 112.

While the Debtor admitted to scheduling what she referred to as an informational meeting with a reverse mortgage specialist in 2007 to determine what options would allow Mrs. McCoy to continue residing in the Southgate Property (Tr. at 109), the Debtor disagreed that she told Mrs. McCoy that she intended to stop paying the mortgage on the Southgate Property. *Id*. at 114. Throughout her testimony, the Debtor maintained that she instead stopped paying the mortgage on the Hillcrest Property but continued to pay the mortgage on the Southgate Property to ensure that a reverse mortgage could be obtained for that property. *Id*. at 114, 124-25.

It is undisputed that the Debtor transported Mrs. McCoy to the meeting with the reverse mortgage specialist without informing any other family members about the meeting. Compl. ¶ 8; Tr. at 34, 37, 112. During the meeting, Mrs. McCoy became confused about the purpose of the meeting and the potential financial ramifications of signing certain documents; she eventually called Ms. Wilson and requested that she join the meeting. Compl. ¶ 9; Tr. at 34-36, 113. The

---

[15] According to Ms.Wilson, the documents comprising Plaintiff's Exhibit 10 were presented to Mrs. McCoy during the meeting with the reverse mortgage specialist. The documents purport to compare several different reverse mortgage options. Ms. Wilson noted that these documents compromise the totality of those she was given at the meeting. Tr. at 37.

meeting with the reverse mortgage specialist concluded at the request of Ms. Wilson, so that Ms.
Wilson could review the potential transaction and ensure that Mrs. McCoy understood the
totality of the process. Compl. ¶ 9; Tr. at 40, 113.

On November 16, 2007, Dominion served Mrs. McCoy with a complaint (hereinafter, the
"Dominion Complaint") seeking satisfaction of the judgment originally obtained against the
Debtor that resulted in a judgment lien being placed against all of the Debtor's real property in
Virginia Beach, Virginia, which included, at the time the judgment was entered, the Southgate
Property. Compl. ¶ 10; Tr. at 30-31, 44-46; Pl.'s Ex. 11 (Dominion Complaint). According to
Ms. Wilson, Dominion filed a lawsuit against Mrs. McCoy after being alerted that ownership of
the Southgate Property was transferred from the Debtor back to Mrs. McCoy. Tr. at 32, 111; *see
also* Pl.'s Ex. 11 (Dominion Complaint). The judgment lien placed against the Southgate
Property by Dominion when the Debtor owned the property was not disturbed by the transfer of
the property back to Mrs. McCoy; thus, Mrs. McCoy became liable on the judgment to
Dominion. *See* Tr. at 32-33, 111; Pl.'s Ex. 11 (Dominion Complaint). The Debtor, however, had
never disclosed the existence of the Dominion debt (which, according to Ms. Wilson, exceeded
$90,000.00 by spring 2008) or the Dominion Judgment to Mrs. McCoy; thus, service of the
Dominion Complaint was a complete surprise to Mrs. McCoy. Compl. ¶ 11; *see* Tr. at 52-55, 63,
119.

Ms. Wilson and the law firm where she was employed during that time represented Mrs.
McCoy with regard to the Dominion Complaint. Tr. at 48-49; *see also id.* at 52-58. The firm
filed an Answer to the Dominion Complaint on Mrs. McCoy's behalf on December 6, 2007. *Id.*
at 48-49; *see also* Pl.'s Ex. 12, Answer to Dominion Complaint dated December 6, 2007. The
Dominion Complaint caused Mrs. McCoy to become anxious about her ability to remain in her

home. Compl. ¶ 11; Tr. at 47-48, 60. Thereafter, a mutual concern developed between Ms. Wilson and the Debtor regarding how Mrs. McCoy could continue residing in the Southgate Property, since Mrs. McCoy did not have the funds to pay the Dominion Judgment or to satisfy the lien resulting from the SunTrust Loan. *See* Tr. at 54-55, 110-14, 136.

In spring of 2008, the Hillcrest Property was in danger of being foreclosed upon due to the Debtor's non-payment, causing the Debtor's financial troubles to mount. Compl. ¶ 14; Answer ¶ 14; Tr. at 50-51, 119-21; Pl.'s Ex. 13, Notice of Substitute Trustee's Sale for the Hillcrest Property.[16] The Complaint alleged that the Debtor, using the notice of possible foreclosure against the Hillcrest Property, induced Mrs. McCoy to financially assist her to allow her to avoid the pending foreclosure. Compl. ¶ 14; Tr. at 50-51, 83. The Debtor denied she induced Mrs. McCoy to provide financial assistance, instead testifying that she informed Mrs. McCoy that she was running out of funds to pay the mortgage and insurance on both the Southgate Property and Hillcrest Property. Tr. at 120, 124-25, 134, 137; Pl.'s Ex. 27, Debtor's Response to Plaintiff's First Set of Interrogatories dated December 24, 2015, and Debtor's Response to Plaintiff's First Request for Production of Documents dated December 24, 2015.[17] She again discussed with Mrs. McCoy the possibility of obtaining a reverse mortgage, and Mrs. McCoy offered to assist the Debtor in any way possible. Tr. at 133-34; Pl.'s Ex. 27 (Debtor's Response to Interrogatory 7).

---

[16] According to the Notice of Substitute Trustee's Sale, more commonly known as a foreclosure sale, the sale was scheduled to take place on April 15, 2008, at the Circuit Court of the City of Virginia Beach, Virginia.

[17] The Debtor's Answer to Plaintiff's Interrogatory 7 states, "After [Mrs.] McCoy gifted the home to [John] McCoy, Jr. and Debtor, technically it was no longer her home. But in our hearts it was always her home so when Debtor['s] funds had run out [the] Debtor went to [Mrs.] McCoy and we talked [a]bout doing the reverse mortgage so that she could be able to live out her life in her home without worries. [Mrs. McCoy] told me she would help in any way possible and we started the process because time was running out."

Despite the parties' divergence on the manner in which the financial assistance came about, the parties do concur that Mrs. McCoy, with Ms. Wilson's counsel, agreed to obtain a reverse mortgage and use the proceeds to satisfy the liens resulting from the Dominion Judgment and the SunTrust Loan; doing so enabled her to continue residing at the Southgate Property and enabled the Debtor to avoid a foreclosure by selling the Hillcrest Property free of any liens. Compl. ¶ 15; *see also* Tr. at 54-56, 62-65, 121; Pl.'s Ex. 2, Confessed Judgment Note dated March 13, 2008; Pl.'s Ex. 14, Deed for Sale of Hillcrest Property dated March 13, 2008; Pl.'s Ex. 15, Settlement Statement for Hillcrest Property and Settlement Statement for the Southgate Property dated March 10, 2008.[18] As a condition of Mrs. McCoy obtaining a reverse mortgage, the Debtor promised to repay Mrs. McCoy for satisfying the debts incurred by the Debtor and John McCoy that resulted in liens being placed against the Southgate Property. *See* Compl. ¶ 13; Tr. at 54, 143.[19]

Ms. Wilson, on behalf of and as attorney for Mrs. McCoy, negotiated with the Debtor regarding the terms of the Debtor's repayment obligation and memorialized the Debtor's promise

---

[18] Plaintiff's Exhibit 15 contains the settlement statements for both the Hillcrest Property and the Southgate Property without distinction. The exhibit also includes payoff instructions from both CitiCorp, the holder of the Debtor's SunTrust Loan, and counsel for Dominion. The settlement statement for the Southgate Property evidences the satisfaction of multiple liens that encumbered the Southgate Property.

[19] The Debtor testified that the parties had originally agreed that the Debtor would repay Mrs. McCoy only $41,000.00. Tr. at 94-95, 102, 142; Def.'s Ex. G, Deed of Trust Note dated September 11, 2007. The Debtor insisted that the original agreement to only pay $41,000.00 reflected the fact that Mrs. McCoy had a pre-existing mortgage on the Southgate Property when the property was transferred to her and John McCoy; thus, the Debtor and Mrs. McCoy would each pay $41,000.00 to satisfy the total debt associated with the Southgate Property. Tr. at 94-95, 117. Ms. Wilson agreed that the original agreement was for the Debtor to pay Mrs. McCoy $41,000.00. *Id.* at 94. Ms. Wilson further testified that the September 2007 Deed of Trust Note was drafted when she thought Dominion had agreed to accept $41,000.00, but Dominion changed the amount they would accept to satisfy their judgment. Ms. Wilson subsequently revised the note to reflect the Debtor's increased debt to Mrs. McCoy; according to Ms. Wilson, she updated the document while the Debtor was present in her office. *Id.* at 94-95.

12

in the Confessed Judgment Note. Tr. at 55-57; Pl.'s Ex. 2. Testimony from Ms. Wilson and the

Debtor showcased lingering confusion regarding certain aspects of the negotiation resulting in

the Confessed Judgment Note. *See* Tr. at 99-102. Ms. Wilson asserted that throughout the

negotiations, the Debtor represented she had no intention of discharging the resulting debt

through bankruptcy and promised to satisfy her debt on the Confessed Judgment Note. *Id*. at 6,

58, 60-61, 78. On the other hand, the Debtor maintained she did not understand the full extent of

the rights she was waiving when she signed the Confessed Judgment Note, including the fact that

she promised to not file bankruptcy to discharge the debt represented by the Confessed Judgment

Note. *Id*. at 99-102, 150. Moreover, although the Debtor recognized that Ms. Wilson was

negotiating on Mrs. McCoy's behalf, the Debtor claims that she did not know that Ms. Wilson

was acting as Mrs. McCoy's attorney; instead, she was under the impression that the transaction

was a family matter. *See id*. at 101-02. However, the Debtor admitted that, by signing the note,

she agreed to all of its contractual terms. *See id*. at 99, 127.

As set forth in the Confessed Judgment Note:

> The [Debtor] acknowledges [Mrs. McCoy] will secure a reverse mortgage, as soon as the papers may be prepared, assuming all of the obligations (outstanding mortgage and Judgment Lien) of the [Debtor] attached to [Mrs. McCoy]'s residence and will release the Judgment with respect to the [Debtor]'s residence, in an effort to avoid the loss of [Mrs. McCoy]'s residence and to assist the [Debtor] in the sell [*sic*] of her residence. The [Debtor] acknowledges that not until full satisfaction of this Note will [Mrs. McCoy] file the necessary documents with the Virginia Beach Circuit Court to reflect satisfaction of the entire Judgment.

> . . . .

> The [Debtor] hereby warrants her intention to satisfy this Note in full and (i) waives homestead exemption, (ii) waives presentment, demand, protest and notice of every kind respecting this note, (iii) agrees that [Mrs. McCoy], at any time or times, without notice to or the consent of them or any of them, may grant extensions of time, without limit as to the number or the aggregate period of such extensions, for the payment of any principal or interest due hereon, and (iv) to the

extent not prohibited by law, waives the benefit of any law or rule of law intended for release or discharge from liability hereon, in whole or in part, on account of any fact or circumstances other than full and complete payment of all amounts due hereunder.

Pl.'s Ex. 2. Pursuant to the terms of the Confessed Judgment Note, the Debtor agreed to repay the principal sum of $153,700.00 with interest at 5%[20] in full by or before April 1, 2013. Compl. ¶ 13; *see also* Tr. at 74, 100, 127-28; Pl.'s Ex. 2. The Confessed Judgment Note provided the Debtor with five years to repay the debt so that she could have time to improve her financial position.[21] Tr. at 57.

Contemporaneous with the Debtor signing the Confessed Judgment Note on March 13, 2008, Mrs. McCoy procured the reverse mortgage, receiving proceeds of $149,746.12. Compl. ¶ 15; Answer ¶ 13; *see also* Tr. at 58, 99-100; Pl.'s Ex. 2; Pl.'s Ex. 15 (Settlement Statement for Southgate Property). She used $86,061.21 of the proceeds to pay off the SunTrust Loan in full and paid $49,500.00 to secure the release of Dominion's lien on the Southgate Property. Compl. ¶ 15; Answer ¶ 15; *see* Tr. at 118; Pl.'s Ex. 15 (Settlement Statement for Southgate Property).[22]

In return for her payment, Dominion filed a Certificate of Release of Memorandum of *Lis Pendens* and submitted a consent order to the Circuit Court of the City of Virginia Beach, Virginia, dismissing the Dominion Complaint against Mrs. McCoy on March 17, 2008. Compl. ¶ 16; Answer ¶ 16; Pl.'s Ex. 16, Certificate of Release of Memorandum of *Lis Pendens* and

---

[20] Although the principal amount of the Confessed Judgment Note was listed as $153,700.00, Ms. Wilson testified that the principal amount borrowed through the reverse mortgage was actually $157,300.00. Tr. at 62. She transposed two numbers when drafting the Confessed Judgment Note. *Id.*

[21] The Debtor initially testified that she never agreed to the five-year term in the Confessed Judgment Note but later admitted that by signing the note she agreed to all of the contractual terms, including the five-year repayment term. Tr. at 127.

[22] Although Dominion's outstanding judgment against the Debtor exceeded $90,000.00, Dominion agreed to accept $49,500.00 (the amount of the underlying judgment) from Mrs. McCoy as a result of her counsel's negotiations with Dominion. Compl. ¶ 15 n.2; Tr. at 54-55, 63.

Consent Order Dismissing Dominion Complaint against Mrs. McCoy.[23] Subsequently, on April 28, 2008, Mrs. McCoy and Dominion executed an assignment of the Dominion Judgment against the Debtor, allowing Mrs. McCoy to become the Debtor's new creditor for the unpaid portion of that debt. Compl. ¶ 16; Answer ¶ 16; Pl.'s Ex. 17, Assignment of Dominion Judgment against the Debtor to Erma C. McCoy dated April 28, 2008.[24] The assignment was apparently recorded in the Circuit Court of the City of Virginia Beach, Virginia on June 27, 2008. Compl. ¶ 16.[25] After Mrs. McCoy became the owner of the unpaid balance of the Dominion Judgment, she filed a Certificate of Partial Release of Memorandum of *Lis Pendens* to allow the Debtor to sell the Hillcrest Property free of any liens, in accordance with the terms of the Confessed Judgment Note. Compl. ¶ 17; Answer ¶ 17; Tr. at 56; Pl.'s Ex. 18, Certificate of Partial Release of Memorandum of *Lis Pendens* dated July 9, 2008.[26]

In 2010, the Debtor purchased a life insurance policy for herself in the amount of $250,000.00, naming her sister as a primary beneficiary and her mother as the contingent beneficiary. Tr. at 81-82; Pl.'s Ex. 25, Life Insurance Policies.[27] The Debtor did not name Mrs.

---

[23] The Certificate of Release of the Memorandum of *Lis Pendens* filed against the Southgate Property is dated March 17, 2008. The copy of the consent order dismissing the Dominion Complaint tendered into evidence is not a copy of the entered order. Pl.'s Ex. 16.

[24] In addition to the assignment of the Dominion Judgment to Erma C. McCoy, Plaintiff's Exhibit 17 contains a settlement agreement between Dominion and Mrs. McCoy dated March 7, 2008, and a copy of the Judgment Order from the Circuit Court of the City of Virginia Beach, Virginia awarding Dominion a judgment against the Debtor, dated September 28, 2006.

[25] A recorded copy of the assignment was not tendered into evidence.

[26] The Court notes that the Certificate of Partial Release tendered into evidence does not bear any evidence of recordation.

[27] Plaintiff's Exhibit 25 contains two life insurance policies the Debtor purchased from American General Life and Accident Insurance Company. The first policy, issued November 10, 2004, lists John McCoy as the primary beneficiary. The second policy, issued November 15, 2010, names the Debtor's sister as the primary beneficiary and lists a face value of $250,000.00. Although the Plaintiff did not clarify which life insurance policy was being referenced during the trial, based on the details provided during Ms. Wilson's testimony, Ms. Wilson was apparently referring to the second policy.

McCoy as a beneficiary of this policy, even though the entire balance of the Confessed Judgment Note was still outstanding and was due three years later. Tr. at 81-82, 132.

The parties agree that by 2013, when the end of the repayment term was reached, the Debtor had failed to submit a single payment to Mrs. McCoy (*id*. at 74, 126), and she subsequently defaulted on the Confessed Judgment Note. Compl. ¶ 18; Answer ¶ 18; *see also* Tr. at 61, 73-74. Before filing a lawsuit to collect on the note, Mrs. McCoy's counsel contacted the Debtor to determine if the Debtor would repay the obligation but received no response. Tr. at 73-74. However, the Debtor asserted that she conveyed to Mrs. McCoy's counsel that she was financially unable to repay the Confessed Judgment Note and told the attorney to garnish her wages. *Id*. at 128, 145. In June 2013, Mrs. McCoy, through counsel, obtained a default judgment against the Debtor in the Circuit Court of the City of Chesapeake, Virginia for the principal amount of $153,700.00; $38,425.00 in interest as of April 1, 2013; $38,425.00 in attorney fees; and $319.00 in costs. *Id*. at 74; Pl.'s Ex. 19, Order of Default Judgment Against Debtor entered June 19, 2013. Mrs. McCoy then sought to enforce the Confessed Judgment Note by garnishing the Debtor's wages. Compl. ¶ 18; Tr. at 74-75. According to Ms. Wilson, $8,286.53 was recovered through the garnishment process. Tr. at 75.

Mrs. McCoy died on January 11, 2015. Compl. ¶ 19; Answer ¶ 19; Tr. at 4, 77. The Debtor filed for bankruptcy on February 9, 2015, and listed Mrs. McCoy as an unsecured creditor because she sought to discharge the debt represented by the Confessed Judgment Note that she had previously promised to pay in full. Compl. ¶ 21; Tr. at 77, 129-30; Pl.'s Ex. 21, Debtor's Voluntary Petition for Bankruptcy filed on February 9, 2015.[28]

---

[28] The Debtor asserts that she attempted to file for bankruptcy in April 2014, but she did not have enough money for the attorney fees. Tr. at 146; Def.'s Ex. I, Receipt from the Law Offices of Steve C. Taylor, P.C., dated April 24, 2014. The Debtor further maintains that she signed her

### III. Conclusions of Law

This Court had multiple occasions to examine the requirements for determining whether an indebtedness is dischargeable pursuant to 11 U.S.C. § 523 and the considerations the Court must weigh when hearing these causes of actions:

> One of the most important benefits of the Bankruptcy Code is its ability to offer debtors a fresh start. This concept of a fresh start demands that courts construe exceptions to discharge narrowly against the objecting creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 561-62 (1915); *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate v. Menna* (*In re Menna*), 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1016 (Bankr. N.D. Ill. 1996) (citing *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir. 1995)). Courts balance this belief in a fresh start with the principle that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998)).

*Miller v. Liatos* (*In re Liatos*), Adv. No. 11-07052-SCS, 2012 WL 3260350, at *5 (Bankr. E.D. Va. Aug. 8, 2012) (quoting *Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 81 (Bankr. E.D. Va. 2005)); *see also Dominion Va. Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 328-29 (Bankr. E.D. Va. 2006).

In the Complaint, the Plaintiff asserts that the debt owed to Mrs. McCoy by the Debtor and embodied by the Confessed Judgment Note is nondischargeable under subsections (a)(2)(A) and (a)(6) of § 523, which prevents the discharge of certain debts:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

---

Chapter 7 petition on January 5, 2015, and she does not understand why it was not filed then. Tr. at 129; Def.'s Ex. J, Documents from the Law Offices of Steve C. Taylor, P.C., dated January 5, 2015; Def.'s Ex. K, Receipt from the Law Offices of Steve C. Taylor, P.C., dated January 5, 2015.

. . . .

      (6) for willful and malicious injury by the debtor to another entity
or to the property of another entity . . . .

*See* 11 U.S.C. §§ 523(a)(2)(A), 523(a)(6).

Under § 523(a), the plaintiff carries the burden of proof and must prove by a preponderance of the evidence that the debt at issue is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988); *In re Robinson*, 340 B.R. at 329; *In re Bowden*, 326 B.R. at 82; *Whitson v. Middleton* (*In re Middleton*), 100 B.R. 814, 818 (Bankr. E.D. Va. 1988). Therefore, the Plaintiff must prove by a preponderance of the evidence that the protections offered by §§ 523(a)(2)(A) or 523(a)(6) apply to the facts alleged and prevent the debt in question from being discharged.

Although the Complaint asserts causes of action pursuant to § 523(a)(2)(A) and § 523(a)(6) of the Bankruptcy Code (Compl. ¶ 24 and Prayer for Judgment), the evidence the Plaintiff presented at trial referenced only the cause of action pled under § 523(a)(2)(A). Furthermore, counsel for the Plaintiff failed to mention any grounds under § 523(a)(6) during her closing argument, instead dedicating her presentation to detailing the elements of § 523(a)(2)(A). *See* Tr. at 154-63. As the Plaintiff failed to present any specific evidence or offer any arguments regarding nondischargeability of the debt pursuant to § 523(a)(6), the Court finds the § 523(a)(6) portion of the Complaint must be denied because the Plaintiff did not meet the burden of proof regarding this claim.

## A. Section 523(a)(2)(A)

The Plaintiff alleges that the debt represented by the Confessed Judgment Note is nondischargeable as a debt obtained by false pretenses, false representations, or actual fraud. It is

well established that a plaintiff must prove the following elements by a preponderance of the

evidence for a debt to be determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(A):

> (1) That the debtor made a representation;
> (2) That at the time the representation was made, the debtor knew the representation was false;
> (3) That the debtor made the false representation with the intention of deceiving the creditor;
> (4) That the creditor relied on such representation; and
> (5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*In re Liatos*, 2012 WL 3260350, at *6 (quoting *In re Bowden*, 326 B.R. at 82); *see also Spinoso*

*v. Heilman* (*In re Heilman*), 241 B.R. 137, 149 (Bankr. D. Md. 1999); *Parker v. Grant* (*In re*

*Grant*), 237 B.R. 97, 112 (Bankr. E.D. Va. 1999); *Hecht's v. Valdes* (*In re Valdes*), 188 B.R.

533, 535 (Bankr. D. Md. 1995); *Clarkson v. Elibuyuk* (*In re Elibuyuk*), 163 B.R. 75, 76 (Bankr.

E.D. Va. 1993).

### 1. Did the Debtor Make a Misrepresentation?

To satisfy the first two elements of § 523(a)(2)(A), the Plaintiff must prove that the

Debtor made a representation to Mrs. McCoy that the Debtor knew to be false. Representations

under § 523(a)(2)(A) may be express or implied. This Court held in both *In re Grant* and *In re*

*Kahler* that an overt misrepresentation is not required by § 523(a)(2)(A); rather, a

misrepresentation may be implied from the debtor's silence. *In re Grant*, 237 B.R. at 113

(finding that the debtor misrepresented his marital status to his landlord by signing his lease

contemporaneously with his girlfriend, who signed her last name so as to give the false

impression she and the debtor were married); *Household Fin. Corp. v. Kahler* (*In re Kahler*), 187

B.R. 508, 512 (Bankr. E.D. Va. 1995) (finding that the debtor implied he could pay the debt

when he cashed a check but failed to disclose his financial troubles); *see also Ocean Equity Grp.,*

*Inc. v. Wooten* (*In re Wooten*), 423 B.R. 108, 121 (Bankr. E.D. Va. 2010) (quoting *Person v.*

Lewis (*In re Lewis*), Adv. No. 94-3116, 1996 WL 33676726, at *8 (Bankr. E.D. Va. Apr. 25, 1996)); *In re Robinson*, 340 B.R. at 345.

The alleged § 523(a)(2)(A) misrepresentation here is that the Debtor signed the Confessed Judgment Note without the intention of repaying this debt. *See* Compl. ¶ 2, 3, 31; *see* Tr. at 6, 57-58, 71, 78-82, 157-60. While the parties agree that the Debtor defaulted on the Confessed Judgment Note (Compl. ¶ 18, Answer ¶ 18; Tr. at 61, 73-74, 145), a breach of contract alone does not constitute a misrepresentation under § 523(a)(2)(A). *In re Grant*, 237 B.R. at 112 (citing *Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996)); *see also Garcia v. Waithe* (*In re Waithe*), Adv. No. 10-0569PM, 2011 WL 1838556, at *2 (Bankr. D. Md. May 13, 2011); *In re Wooten*, 423 B.R. at 121-22; *In re Heilman*, 241 B.R. at 149. If the debtor never intended to fulfill the contract and subsequently defaults, however, the broken contract may serve as the basis for a successful nondischargeability action under § 523(a)(2)(A). *In re Grant*, 237 B.R. at 112-13; *see also In re Wooten*, 423 B.R. at 121-22; *McKee Builders, Inc. v. Knight* (*In re Knight*), 377 B.R. 590, 597 (Bankr. E.D. Tenn. 2007) (citing *In re Grant*, 237 B.R. at 112-13).

For the unfulfilled contract to serve as a basis for a nondischargeability claim, the debtor must have the intention not to perform the promised acts at the moment the contract is formed. *Webb v. Isaacson* (*In re Isaacson*), 478 B.R. 763, 775 (Bankr. E.D. Va. 2012); *In re Heilman*, 241 B.R. at 150 (citing *Lawyers Title Ins. Corp. v. Pitt*, 157 B.R. 585 (E.D. Va. 1991)). Thus, courts must examine the debtor's state of mind at the time when the promise in question is made. "[A] debtor's subjective belief that he or she intends to perform the contract is germane . . . where the creditor . . . contends that Section 523(a)(2)(A) applies based on the debtor's alleged implied representation that the debtor intends to perform the contract." *Ultra Litho, PYT, Ltd. v.*

*Moore* (*In re Moore*), 365 B.R. 589, 605 (Bankr. D. Md. 2007), *aff'd per curiam*, 347 F. App'x

971 (4th Cir. 2009); *see, e.g.*, *Cobra Well Testers, LLC v. Carlson* (*In re Carlson*), No. 06-8158,

2008 WL 8677441, at *3 (10th Cir. Jan. 23, 2008) (alteration in original) (citations omitted)

("[T]he evidence at trial showed only a subsequent breach of contract, and a 'mere inability or

failure to perform is not, in itself, sufficient evidence of fraudulent intent [for purposes of §

523(a)(2)(A)].'"); *FIA Card Servs. v. Flowers* (*In re Flowers*), 391 B.R. 178, 182 (M.D. Ala.

2008) ("[The plaintiff] relies solely on [the debtor]'s alleged inability to repay his loan, even

though it has been thoroughly established that the 'failure to perform, alone, is not evidence of

intent not to perform at the time the promise was made. If it were, a mere breach of contract

would be tantamount to fraud.'") (quoting *Purcell Co. v. Spriggs Enters., Inc.*, 431 So.2d 515,

519 (Ala. 1983)); *Hall v. Jackson* (*In re Jackson*), 348 B.R. 595, 599 (Bankr. M.D. Ga. 2006)

("'The failure to perform a mere promise is not sufficient to make a debt nondischargeable

[under § 523(a)(2)(A)], even [if] there is no excuse for the subsequent breach.'") (quoting 4

Collier on Bankruptcy ¶ 523.08[1][d] (15th ed. rev. 2006)); *Hoit-Thetford v. Levine* (*In re

Levine*), 337 B.R. 840, 844 (Bankr. E.D. Va. 2005) ("The evidence makes reasonably clear that

debtor had little intent or ability to perform the contract."); *Donaldson v. Hayes* (*In re Hayes*),

315 B.R. 579, 587 (Bankr. C.D. Cal. 2004) ("In order for a representation regarding future

performance to be actionable under § 523(a)(2)(A), a debtor must lack an intent to perform when

the promise was made.") (citing *Anastas v. Am. Sav. Bank* (*In re Anastas*), 94 F.3d 1280, 1285

(9th Cir. 1996)); *First Baptist Church v. Maurer* (*In re Maurer*), 112 B.R. 710, 713 (Bankr. E.D.

Pa. 1990) ("It is well established that a finding of fraud [under § 523(a)(2)(A)] cannot be

premised upon a mere breach of contract. Instead, to be actionable as fraud, the plaintiff must

establish that the debtor entered into the contract with the intent of never complying with its

21

terms.") (citations omitted); *see also Thomas Somerville Co. v. Slaughter* (*In re Slaughter*), Adv. No. 95-3023, 1995 WL 506827, at *2 (Bankr. E.D. Va. July 7, 1995) ("[A] misrepresentation of intention can constitute fraud, although mere inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent.") (quoting *Williams v. Zachary* (*In re Zachary*), 147 B.R. 881, 883 (Bankr. N.D. Tex. 1992)) (citations omitted). Courts must assess the totality of the circumstances by a subjective standard to determine whether the debtor believed he would perform his duties under the contract, or instead, whether he intended to defraud a creditor. *Johnson v. Dowling*, No. 6:12-cv-00065, 2013 WL 684681, at *3 (W.D. Va. Feb. 25, 2013); *In re Knight*, 377 B.R. at 597 (citing *Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 281-82 (6th Cir. 1998)).

During the trial, the Plaintiff further alleged that the Debtor made several other implicit and express misrepresentations to Mrs. McCoy in addition to the misrepresentation that she intended to repay the debt set forth in the Confessed Judgment Note. *See* Tr. at 155-57 (counsel summarizing these misrepresentations during final arguments). These alleged misrepresentations included: the Debtor's assurances to Mrs. McCoy that she would not need to worry about making future mortgage payments (*see id.* at 108; *see also* Pl.'s Ex. 27 (Debtor's Response to Interrogatory 7)); the Debtor's lack of voluntary payment towards satisfaction of the Confessed Judgment Note (Tr. at 74, 126); her failure to inform Mrs. McCoy about the liens encumbering the Southgate Property before she transferred the property back to Mrs. McCoy in 2007 (*id.* at 47); and the Debtor's attempt to discharge the subject obligation by filing a bankruptcy petition despite prior representation to the contrary that she would do so (*see id.* at 77-78). The Court finds that these allegations are best viewed not as separate specific misrepresentations, but rather as circumstantial evidence advanced by the Plaintiff in support of the overarching allegation that

22

the Debtor entered into the Confessed Judgment Note without intending to fulfill the contract. The Court will divide the analysis of the circumstantial evidence surrounding the misrepresentations into two spheres: those related to the Debtor's intentions before the parties entered into the Confessed Judgment Note, and those related to the Debtor's actions after the Confessed Judgment Note was signed.

The Court will first discuss the acts that occurred after the Confessed Judgment Note was signed. For example, the Plaintiff highlights the Debtor's failure to both name Mrs. McCoy and, later, her estate, as the beneficiary to her life insurance policy (*id.* at 81-82, 84, 132) and to submit any voluntary payments towards the Confessed Judgment Note as indicators of the Debtor's malevolent intentions upon entering into the contract with Mrs. McCoy. *Id.* at 74, 126. The Plaintiff also points to the Debtor's attempt to discharge the debt represented by the Confessed Judgment Note by filing bankruptcy after Mrs. McCoy's death as another indication that the Debtor never intended to perform under this contract. *See id.* at 77-78. However, all of these actions occurred after the signing of the Confessed Judgment Note, and the Plaintiff has failed to offer any additional evidence to link these actions to the Debtor's pre-contract formation behavior and intent. Thus, they are superfluous to the Debtor's state of mind and intentions during the contract formation, the relevant point of inquiry. The Court will instead focus on the actions that occurred before Mrs. McCoy and the Debtor entered into their contract.

As to circumstantial evidence related to acts occurring before the formation of the Confessed Judgment Note, the Plaintiff alleged that the Debtor falsely assured Mrs. McCoy that she would not need to make future mortgage payments (*id.* at 108, 134-35; *see also* Pl. Ex. 27 (Debtor's Response to Interrogatory 7)), and later begged Mrs. McCoy to assist her financially so that Mrs. McCoy could continue to reside at the Southgate Property. Compl. ¶ 14, Tr. at 50-51,

23

58, 83. The Plaintiff also took umbrage with the fact that the Debtor never informed Mrs. McCoy about the liens that encumbered the Southgate Property. *See* Compl. ¶ 11; *see* Tr. at 53, 55, 63, 119.  Finally, the Plaintiff asserted that the Debtor's failure to use the life insurance proceeds she received after John McCoy passed away to satisfy the debts encumbering the Southgate Property (which the Debtor admits she did not do) serves as further evidence of the fraud inherent in the Debtor's actions and her intent not to repay the Confessed Judgment Note. Compl. ¶ 5 n.1; Tr. at 59, 71-73, 123.

Regarding the Plaintiff's allegation that the Debtor begged for Mrs. McCoy's assistance to forestall an impeding foreclosure on the Southgate Property, the evidence submitted to the Court supports the Debtor's assertion that she was running out of funds to pay the mortgage on the Southgate Property. *See* Pl.'s Ex. 8, Asset Account Confirmation Certificate (Letter from the Debtor to Fidelity and Guaranty Life Insurance Company dated January 16, 2008 (requesting to withdraw the remaining funds in the account)); Pl.'s Ex. 24, Debtor's Resumé. John McCoy and the Debtor's decisions to encumber the Southgate Property with a substantial amount of debt and the Debtor's subsequent default on those debts were certainly not advisable given the Debtor's stated desire for Mrs. McCoy's continued residence there; nonetheless, that Mrs. McCoy would be forced to move if the liens encumbering the Southgate Property were not satisfied and eventually foreclosed upon, was a true, if very unfortunate, statement. Accordingly, the Court does not find such statement to be a misrepresentation.

Closely connected to the above allegation is the Plaintiff's assertion that the Debtor failed to inform Mrs. McCoy about the liens encumbering the Southgate Property. The evidence demonstrates that Mrs. McCoy was unaware of the Dominion Judgment's existence, and corresponding lien on the Southgate Property, until after she was served by the Dominion

24

Complaint. Compl. ¶ 11; *see* Tr. at 53, 55, 63, 119. The Debtor also testified that she did not know about the judgment lien Dominion had obtained on the Southgate Property until more than a year after Dominion obtained a default judgment against her. Tr. at 107, 119. The Debtor similarly testified that she did not know that Mrs. McCoy was legally responsible for the SunTrust Loan. *Id*. at 110.

Regardless of whether the Court finds the Debtor's testimony to be truthful, some uncertainty remains surrounding Mrs. McCoy's knowledge of the SunTrust Loan. During the trial, the Debtor insisted that the SunTrust Loan was combined debt she owed with John McCoy and Mrs. McCoy. *See id*. at 108, 116-18. The Court finds the Debtor's testimony to be credible regarding the components of the SunTrust Loan, as the exhibits show that the 2002 transfer of the Southgate Property was subject to a pre-existing lien. Def.'s Ex. E, Deed of Gift transferring ownership of the Southgate Property from Erma C. McCoy to John McCoy and the Debtor dated October 1, 2002 (referencing an existing lien on the property in the principal sum of $47,000.00). Unfortunately, neither party presented any testimony or evidence that could speak to Mrs. McCoy's knowledge of the status of the SunTrust Loan after 2002. Admittedly, the Debtor should have shared information regarding the existence and status of the liens encumbering the Southgate Property when she transferred the property back to Mrs. McCoy in 2007. While the Debtor's failure to disclose the existence of the liens before the 2007 transfer appears dubious at first glance, the Plaintiff did not sufficiently prove that the Debtor knew about the lien created by the Dominion Judgment before the 2007 transfer or that Mrs. McCoy did not know about the SunTrust Loan encumbering the property.

Similarly, the Court finds the Debtor's representation to Mrs. McCoy that she would not need to make future mortgage payments for the reverse mortgage does not indicate any

fraudulent intent. Reverse mortgages are a special type of loan taken out against the subject property that do not require a borrower to make mortgage payments, but the loan is due in full when the elderly borrower dies. The Debtor's statement that Mrs. McCoy did not need to worry about making mortgage payments during her lifetime was true and thus does not constitute a misrepresentation.

Likewise, the Court finds that the Plaintiff's assertion that the Debtor's failure to use the life insurance proceeds received after John McCoy's death to pay the SunTrust Loan and the Dominion Demand Note does not evidence any fraudulent intent on the part of the Debtor at the time she signed the Confessed Judgment Note. The sum the Debtor received, approximately $204,000.00, was not insubstantial, and it appears could have paid these debts in full. It is unrefuted that the Debtor used the life insurance proceeds as her sole source of income, using the proceeds to pay the mortgages, taxes, and insurance on both the Southgate and Hillcrest properties. Tr. at 59, 71-73, 125-26. She also traveled and purchased a new car after receiving the proceeds. *Id*.; *see also id.* at 123. By the time the Debtor signed the Confessed Judgment Note on March 13, 2008, the life insurance proceeds were depleted. *See id*. at 29, 124; Pl.'s Ex. 8, Asset Account Confirmation Certificate (Letter from the Debtor to Fidelity and Guaranty Life Insurance Company dated January 16, 2008). While the Debtor's use of a portion of the life insurance proceeds was financially ill-advised in light of her outstanding debts, such misguided behavior does not equate to fraud and does not evince an intent not to repay the Confessed Judgment Note she entered into three years after receiving the life insurance proceeds. Therefore, the Court does not find that the circumstantial evidence presented by the Plaintiff sufficiently demonstrates that the Debtor never intended to satisfy the Confessed Judgment Note.

26

The Court finds that the testimony elicited at trial evidences the Debtor's intentions to fulfill the terms of her contract with Mrs. McCoy at the time the parties entered into the Confessed Judgment Note. *See* Tr. at 121, 127.[29] The Plaintiff admitted the Debtor always promised that she would "do the right thing"—in other words, repay Mrs. McCoy in exchange for Mrs. McCoy procuring the reverse mortgage and satisfying the Debtor's debts—to allow Mrs. McCoy to continue to reside in the Southgate Property. *Id.* at 57, 121, 134-35, 143; Pl.'s Ex. 27 (Debtor's Response to Interrogatory 7). The Debtor's testimony is bolstered by the fact that she agreed to a five-year period within which to repay Mrs. McCoy. Tr. at 57-58 (Ms. Wilson testifying that, while she desired for the sum to be repaid immediately, the Confessed Judgment Note contained a five-year repayment term to enable the Debtor to improve her financial condition); *see also* Pl.'s Ex. 2, Confessed Judgment Note. *But see* Tr. at 127 (Debtor testifying she did not agree to the five-year term but confirming she nonetheless signed the note). The Debtor's intention to repay the debt is also evidenced by the fact that she became employed by Air Wisconsin in April 2008, shortly after she entered into the Confessed Judgment Note in March 2008, even though the Debtor had previously been unemployed for a prolonged period of time. *See* Pl.'s Ex. 2, Confessed Judgment Note; Pl.'s Ex. 24, Debtor's Resumé. Weighing the evidence presented to the Court, the Court finds the Plaintiff has failed to show, by a preponderance of the evidence, that the Debtor did not intend to satisfy the Confessed Judgment Note at the time the parties entered into the transaction. Accordingly, the Court finds that Debtor's subsequent and ultimate breach of that contract does not constitute a misrepresentation under § 523(a)(2)(A).

---

[29] Ms. Wilson also testified at numerous intervals that the Debtor stated that she did not intend to discharge her debt represented by the Confessed Judgment Note. Tr. at 6, 58, 60-61, 78.

### 2. Devious Intent

Although the Court concludes that the Debtor's breach of the promise to repay Mrs. McCoy does not constitute a misrepresentation for the purposes of a § 523(a)(2)(A) cause of action, the Court will nonetheless address the additional elements of the Plaintiff's § 523(a)(2)(A) claim. Thus, the Court now examines whether, assuming arguendo that the Debtor knowingly made a false representation, such false representation was made with the intention of deceiving Mrs. McCoy.

There is often a lack of direct evidence for causes of action arising under § 523(a)(2)(A); a plaintiff is therefore forced to prove the debtor's state of mind by relying on circumstantial evidence to enable the Court to infer such intent. This Court previously held that "direct proof of intent (*i.e.*, the debtor's state of mind) is nearly impossible to obtain . . . ." *In re Bowden*, 326 B.R. at 87 (quoting *Universal Bank, N.A. v. Grause* (*In re Grause*), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000)) (citing *Marunaka Dainichi Co. v. Yamada* (*In re Yamada*), 197 B.R. 37, 40 (Bankr. E.D. Va. 1996); *W. Union Corp. v. Ketaner* (*In re Ketaner*), 154 B.R. 459, 465 (Bankr. E.D. Va. 1992)). Courts may presume that a debtor had the requisite intent to deceive if the debtor made a false representation that she knew or should have known would induce a creditor's reliance and the debtor intended to defraud the creditor at the time she made the false representation. *Id.* at 86-87 (citing *In re Grant*, 237 B.R. at 115). Moreover, if a creditor establishes devious intent through circumstantial evidence, a debtor's unsupported assertions of honest intent will not be enough to overcome this presumption. *Id.* (citing *In re Yamada*, 197 B.R. at 40; *In re Ketaner*, 154 B.R. at 465).

The Complaint vaguely (and somewhat disjointedly) describes a scheme of fraud launched by the Debtor (with John McCoy's participation early on) to have Mrs. McCoy assume

28

her debts and subsequently renege on her promise to repay that debt. *See* Compl. ¶¶ 4-15, 18. In light of the evidence presented at trial, the Plaintiff appears to desire the Court to view the Debtor's actions from the time the debts were incurred on the Southgate Property throughout the initial inquiry into the reverse mortgage process to serve as circumstantial evidence of the Debtor's intention never to repay the Confessed Judgment Note.

At trial, the Plaintiff pointed to several other acts as indicative of the Debtor's scheme to deceive Mrs. McCoy about her intentions to fulfill the Confessed Judgment Note. The Plaintiff argued that it was suspicious that Mrs. McCoy did not have the advice of counsel or consult with any other family members when she gifted the Southgate Property to the Debtor and John McCoy in 2002 and, thus, Mrs. McCoy probably did not understand the potential ramifications of the transactions. *See* Tr. at 42-43, 70, 131, 134. The Plaintiff, however, did not present any evidence to show that Mrs. McCoy was unfit to enter into legally binding decisions at that time.[30] Mrs. McCoy's motivation to gift the Southgate Property to John McCoy and the Debtor is simply unknown. Further, nothing in the record suggests that the Debtor had an independent duty to persuade Mrs. McCoy to procure legal advice for the 2002 transaction. Thus, the Debtor's failure to urge Mrs. McCoy to consult with an attorney or other family members does not prove that the Debtor entered into this transaction with the intent to deceive Mrs. McCoy.

It is undisputed that the transfer of the Southgate Property provided John McCoy and the Debtor the opportunity to encumber the property with a substantial amount of debt, as exhibited by the SunTrust Loan (Compl. ¶ 4; Tr. at 19, 103-04; Pl.'s Ex. 3, SunTrust Equity Application dated October 22, 2002; Pl.'s Ex. 5, SunTrust Certificate of Transfer of Deed of Trust to CitiCorp dated November 18, 2002) and the Dominion Judgment (*see* Tr. at 32, 119, Pl.'s Ex. 11

---

[30] Ms. Wilson candidly admitted she had little knowledge of Mrs. McCoy's financial affairs and her interactions with John McCoy and the Debtor prior to 2006. Tr. at 93.

(Dominion Judgment); *see also* Pl.'s Ex. 15 (Settlement Statement for the Southgate Property

dated March 10, 2008)). While the pledging of the Southgate Property as collateral by the Debtor

and John McCoy was certainly not wise given Mrs. McCoy's continued residence there, these

actions occurred years before the Debtor entered into the Confessed Judgment Note. The

evidence shows that the Debtor and John McCoy were the owners of the Southgate Property at

the time they encumbered the property. *See* Def.'s Ex. E, Deed of Gift transferring ownership of

the Southgate Property from Erma C. McCoy to John McCoy and the Debtor dated October 1,

2002. Although sometimes a regrettable decision, it is certainly not unusual for a homeowner to

use his property as collateral to secure other unrelated debts. In this instance, the Court does not

find this behavior indicative of any eventual nefarious intention when the Confessed Judgment

Note was signed. Admittedly, the Debtor's decision to transfer the Southgate Property back to

Mrs. McCoy in 2007 after the property had been encumbered with a great deal of debt appears to

be suspicious and opportunistic behavior. The Plaintiff has supplied no evidence, circumstantial

or otherwise, to show that the transfer of the Southgate Property was procured fraudulently or

was the genesis of a multi-year-long scheme in an effort to defraud Mrs. McCoy.

Similarly, the Plaintiff pointed to the Debtor's refusal to inform Mrs. McCoy's other

family members about the 2007 meeting with the reverse mortgage specialist as proof of the

Debtor's dishonest intentions and fraudulent scheme. *See* Compl. ¶¶ 7-9; *see also* Tr. at 34, 37,

112. In an ideal world, the Debtor would have informed Mrs. McCoy's other family members

about the reverse mortgage meeting. Regardless of how surreptitious other family members may

have viewed this event, the Debtor did not have any obligation to inform or discuss the

possibility of a reverse mortgage with the other family members. This conclusion is compelled

by the lack of any evidence that Mrs. McCoy was mentally or physically incapacitated or

30

deficient. The Debtor repeatedly, and the Court finds, credibly, testified throughout the trial that her goal was to allow Mrs. McCoy to remain in the Southgate Property despite the fact that the property was encumbered by an overwhelming amount of debt. Tr. at 107-08, 114, 121; Pl.'s Ex. 27 (Debtor's Response to Interrogatory 7). The Debtor's insistence that this was her plan for Mrs. McCoy, in conjunction with Ms. Wilson's testimony that she too became worried about Mrs. McCoy's ability to continue to reside in the Southgate Property until the end of her life (Tr. at 54-55, 112-14, 135), lends credibility to the Debtor's testimony about her intentions regarding the reverse mortgage and the benefit it could confer upon Mrs. McCoy given the existing circumstances.

Furthermore, Ms. Wilson eventually joined the meeting about the reverse mortgage process held in the fall of 2007 and reviewed documents pertaining the reverse mortgage process afterwards. Compl. ¶ 9; Tr. at 34-36, 40, 113. The Debtor testified that she was aware Mrs. McCoy requested Ms. Wilson join the reverse mortgage meeting and welcomed Ms. Wilson's involvement in the process. Tr. at 112-13. Ms. Wilson also played a key role as Mrs. McCoy's attorney in the negotiations regarding the Dominion Complaint, Mrs. McCoy's procurement of a reverse mortgage in 2008, and the Debtor's agreement to enter the Confessed Judgment Note. *See id*. at 55-57. Thus, the Court does not find the Debtor's neglect in informing Mrs. McCoy's other family members that the Southgate Property about the fall 2007 reverse mortgage meeting to evidence any devious intention by the Debtor at the time she entered into the Confessed Judgment Note.

The Plaintiff further alleged that the Debtor entered into the Confessed Judgment Note even though her prior work history[31] suggested that she did not have the capacity to repay the note. *Id.* at 58-59, 71; Pl.'s Ex. 24, Debtor's Resumé. The Plaintiff attempted to bolster this argument by highlighting that the Debtor never made any voluntary payments on the note. Tr. at 74, 126. The Plaintiff's assertion that the Debtor's employment history suggested an unrealistic expectation that she could satisfy the Confessed Judgment Note is not wholly supported by the evidence. Even if it was, the Court finds that the Debtor's inability to realize her own financial constraints does not mean that she entered into the contract with bad faith or with the intention to deceive Mrs. McCoy. Instead, this behavior is most likely reflective of the Debtor's unrealistic fiscal expectations. Similarly, the Debtor's failure to remit any payments for this debt before her wages were garnished is of no moment to the question of whether the Debtor entered into the contract in bad faith; these actions occurred after the formation of the Confessed Judgment Note, the salient point in time the Court must examine.

At best, the Debtor's actions described above suggest poor decision making and judgment regarding monetary matters and a failure to recognize her economic limitations. Again, the Debtor's financial behavior, while irresponsible, does not necessarily suggest she engaged in this series of activities with the purpose of convincing Mrs. McCoy to assume her debts. Furthermore, many of the actions described were undertaken quite some time before Mrs. McCoy agreed to obtain the reverse mortgage, making it even more unlikely that the Debtor planned these activities with the intention that she would one day, years later, convince Mrs. McCoy to assume all of her outstanding debt under the false promise that she would eventually repay Mrs. McCoy for her generosity. The evidence submitted by the Plaintiff fails to

---

[31] The Debtor testified that the grief and pain she suffered after her husband's death caused her to stop working between 2005 and 2008. *See* Tr. at 124-26, 145.

demonstrate that the Debtor never intended to perform her obligations under the Confessed

Judgment Note and that the Debtor possessed the requisite devious intent for a § 523(a)(2)(A)

cause of action.

### 3. Justifiable Reliance

A successful § 523(a)(2)(A) claim also requires that a plaintiff show justifiable reliance

upon the debtor's misrepresentation. Judge Kenney has discussed this requirement at length:

> In 1995, the Supreme Court issued its decision in the case of *Field v.
> Mans*, 516 U.S. 59 (1995). In *Field v. Mans*, the Court decided that, in order to
> prove a case of actual fraud under Section 523(a)(2)(A), the Plaintiffs needed only
> to prove "justifiable reliance," not the more demanding standard of "reasonable
> reliance." *Id.* at 77. Relying on the Restatement (Second) of Torts, as well as W.
> Prosser, *Law of Torts*, (4th Ed. 1971), the Court explained the standard of
> justifiable reliance as follows:
>
>> . . . . a person is justified in relying on a representation of fact
>> "although he might have ascertained the falsity of the
>> representation had he made an investigation." [Restatement
>> (Second) of Torts], § 540. Significantly for our purposes, the
>> illustration is given of a seller of land who says it is free of
>> encumbrances; according to the Restatement, a buyer's reliance on
>> this factual representation is justifiable, even if he could have
>> "walked across the street to the office of the register of deeds in the
>> courthouse" and easily have learned of an unsatisfied mortgage.
>> [Restatement (Second) of Torts], § 540, Illustration 1. The point is
>> otherwise made in a later section noting that contributory
>> negligence is no bar to recovery because fraudulent
>> misrepresentation is an intentional tort. Here a contrast between a
>> justifiable and reasonable reliance is clear: "Although the
>> plaintiff's reliance on the misrepresentation must be justifiable . . .
>> . this does not mean that his conduct must conform to the standard
>> of the reasonable man. Justification is a matter of the qualities and
>> characteristics of the particular plaintiff, and the circumstances of
>> the particular case, rather than of the application of a community
>> standard of conduct to all cases." *Id.*, § 545A, Comment B.

*Hong v. Merzoug* (*In re Merzoug*), Adv. No. 11-01228, 2012 WL 845528, at *3-4 (Bankr. E.D.

Va. Mar. 12, 2012) (quoting *Field v. Mans*, 516 U.S. 59, 70-71 (1995)). As Judge Kenney's

decision reminds, the Court should not determine whether Mrs. McCoy's reliance was

reasonable by an objective standard, but instead, should measure the justifiability of Mrs.

McCoy's reliance based on her individual qualities. However, the usage of a subjective standard

to measure reliance does not mean that a plaintiff pursuing a § 523(a)(2)(A) cause of action can

disregard potential "warning signs." As Judge Aron explains:

> [A] plaintiff is still "'required to use his senses, and cannot recover if he blindly
> relies upon a misrepresentation the falsity of which would be patent to him if he
> had utilized his opportunity to make a cursory examination and investigation.'"
> *Id*. at 71 (quoting Restatement (Second) of Torts § 541 cmt. A (1976)). Thus, a
> plaintiff who disregards "red flags" will not be able to satisfy the justifiable
> reliance standard. *Giovanni v. Grayson Kubli & Hoffman* (*In re Giovanni*), 324
> B.R. 586, 594 (E.D. Va. 2005) (citing *Anastas v. Am. Sav. Bank* (*In re Anastas*),
> 94 F.3d 1280, 1286 (9th Cir. 1996)). *See also Copper v. Lemke* (*In re Lemke*), 423
> B.R. 917, 924-25 (B.A.P. 10th Cir. 2010) (holding that reliance was not justifiable
> because plaintiff continued to lend money "after various red flags arose"); *Rice,
> Heitman & Davis v. Sasse* (*In re Sasse*), 438 B.R. 631, 650 (Bankr. W.D. Wis.
> 2010) (denying plaintiff-law firm's claim pursuant to § 523(a)(2)(A) where
> plaintiff-law firm "ignored numerous red flags and warning signs"); *Andresen &
> Arronte, PLLC v. Hill* (*In re Hill*), 425 B.R. 766, 779 (Bankr. W.D.N.C. 2010)
> (concluding that the plaintiff-law firm did not justifiably rely on the debtor's false
> representations because it continuously ignored warning signs regarding her
> financial condition); *Dominion Va. Power v. Robinson* (*In re Robinson*), 340 B.R.
> 316, 349-50 (Bankr. E.D. Va. 2006) (holding that plaintiff did not justifiably rely
> on debtor's false representations because it continuously ignored "red flags"
> regarding debtor's behavior); *Weeber v. Boyd* (*In re Boyd*), 322 B.R. 318, 325-26
> (Bankr. N.D. Ohio 2004) (holding that the plaintiff's reliance was not justifiable
> because he had "special knowledge" of the risks associated with lending the
> debtor money).

*Winston-Salem City Employees' Fed. Credit Union v. Casper* (*In re Casper*), 466 B.R. 786, 794

(Bankr. M.D.N.C. 2012); *see also In re Liatos*, 2012 WL 3260350, at *11-12. Therefore, a duty

to investigate arises when circumstances present various red flags that should serve as warnings

to creditors. *Phoenix Equity Ventures v. Baillio* (*In re Baillio*), Adv. No. 08-1124S, 2010 WL

3782065, at *16 (Bankr. D.N.M. Sept. 21, 2010) (citing *Field*, 516 U.S. at 72).

   The Complaint perfunctorily states that Mrs. McCoy relied on the Debtor's

misrepresentations (Compl. ¶ 30) but does not detail how her reliance on the alleged

misrepresentations led her to conclude she should obtain the reverse mortgage. During closing statements, counsel for the Plaintiff argued that Mrs. McCoy relied on the false and fraudulent representations of the Debtor due to the trust, love, and affection that she had for the Debtor. Tr. at 161. The Plaintiff, however, did not present any evidence at trial to demonstrate why Mrs. McCoy's reliance on the alleged misrepresentations was justifiable or how such reliance compelled her expectation that the Debtor would repay the Confessed Judgment Note. Thus, based on the lack of evidence presented regarding Mrs. McCoy's reliance, the Court must find that the Plaintiff has failed to satisfy the reliance prong of § 523(a)(2)(A).

Instead, the evidence the Plaintiff did present shows Mrs. McCoy relied not only on the Debtor's representations but also on advice of counsel. Mrs. McCoy was an older individual (*id*. at 4-5) who had not finished high school (*id*. at 6) but still monitored her finances fastidiously. *Id*. at 12-13. Mrs. McCoy was represented by counsel, her granddaughter Ms. Wilson, and her law firm, during negotiations with both Dominion regarding resolution of the Dominion Complaint and the Debtor concerning the Confessed Judgment Note. *See id*. at 48-49, 52-58. Mrs. McCoy's lack of formal education is less of a disability vis-à-vis her justifiable reliance because she was represented by counsel during her transactions with the Debtor.[32] Whether Mrs. McCoy justifiably relied on the representations must necessarily be analyzed in light of the fact that she received third-party legal advice during the totality of her transaction. *Cf. In re Baillio*, 2010 WL 3782065, at *16.

---

[32] Traditionally, a creditor's representation by counsel affects the standard of care by which the court judges the creditor's action. *See Brisbach v. Brisbach* (*In re Brisbach*), 36 B.R. 350, 354 (Bankr. W.D. Wis. 1984) ("[S]omething more than the ordinary care of a lay person must be demonstrated when a complaining creditor is represented by an attorney. The sophistication of the creditor must be presumed to increase when that creditor has active legal counsel."); *see also Berk v. Stewart* (*In re Stewart*), 10 B.R. 214, 218 (Bankr. C.D. Cal. 1981).

From the record before the Court, it appears that neither Mrs. McCoy nor counsel on her behalf undertook any sort of cursory investigation of the Debtor's financial history beyond those facts which they learned during the course of the transaction before assuming the large debt and accepting the Confessed Judgment Note from the Debtor. Mrs. McCoy and Ms. Wilson discovered in the months leading up to the Debtor signing the Confessed Judgment Note that the Debtor had proven herself to be fiscally unreliable, with a documented history of defaulting on debts, such as the Dominion Demand Note. *See* Tr. at 106-07; Pl.'s Ex. 4 (Dominion Demand Note); *see also* Tr. at 30-31. Mrs. McCoy and her counsel had witnessed first-hand the fallout from the Debtor's monetary problems over the years, giving them knowledge not necessarily apparent to a third-party about the Debtor's financial background, such as the Debtor's poor financial decisions after John McCoy's death in 2005.[33] During her testimony, Ms. Wilson admitted that after learning about various aspects of the Debtor's past, she became wary of the Debtor and skeptical as to whether the Debtor truly intended to repay Mrs. McCoy. Tr. at 58. The various red flags and warning signs that were discovered by Ms. Wilson are necessarily imputed upon Mrs. McCoy since Ms. Wilson was acting as her counsel. Given this knowledge, it is remarkable that the various warning signs about the Debtor's financial behaviors were ignored, the reverse mortgage was obtained, and Mrs. McCoy accepted the Confessed Judgment Note from the Debtor.

Further, the Court notes that the Plaintiff presented inconsistent perspectives regarding the Debtor's ability to fulfill the Confessed Judgment Note. The Complaint states that the Debtor

---

[33] As discussed at length earlier in the opinion, the Debtor received over $200,000.00 in life insurance proceeds after John McCoy's death in 2005. Tr. at 27-28; Pl.'s Ex. 8, Asset Account Confirmation Certificate. However, the Debtor did not use these funds frugally and depleted the account by January 16, 2008. *See* Tr. at 124; Pl.'s Ex. 8 (Letter from the Debtor to Fidelity and Guaranty Life Insurance Company dated January 16, 2008).

had significant earning potential, including many years of employment in her future before retirement, and she promised there was no need to question her intent to satisfy the debt. Compl. ¶ 31. The Complaint, then, implies that it was reasonable for Mrs. McCoy to believe that the Debtor would fulfill her promise. During closing arguments, however, counsel for the Plaintiff queried whether the Debtor realistically could have thought that she would be able to repay the note given her previous employment history, stating that the "[Debtor's] resumé also shows she doesn't have an extensive earnings capacity. The highest she made was approximately twenty-four dollars an hour at Air Wisconsin. And how that was going to be accomplished in five years would be—it would be phenomenal if she was actually able to do that." Tr. at 159-60.

Thus, from this evidence, it appears ill-advised for Mrs. McCoy and her counsel to have relied on the Debtor's promise to fulfill the Confessed Judgment Note. If nothing else, the Debtor's proximate financial troubles, prolonged period of unemployment after her husband's death, and past work history—all known to Mrs. McCoy and her counsel—should have been warning signs of the Debtor's potential inability to fulfill the contract. Additionally, that Mrs. McCoy was represented by counsel further strengthens the argument for recognition of these warning signs presented by the Debtor's financial and personal history and that it was not justifiable for Mrs. McCoy to rely on the Debtor's promise to fulfill her obligations under the Confessed Judgment Note.

### 4. Damages

The Court has found that the Plaintiff failed to show that the Debtor signed the Confessed Judgment Note without the intent to repay it and that this breach of contract does not constitute a misrepresentation. Furthermore, even if this breach of contract is viewed as a misrepresentation, the Plaintiff has failed to demonstrate that the Debtor possessed the requisite intent to deceive

Mrs. McCoy when making such representation. Finally, the Court has also determined that Mrs. McCoy's reliance on the promise to satisfy the Confessed Judgment Note was not justified. Thus, because the Plaintiff did not satisfy the burden of proof under §§ 523(a)(2)(A), the Court must conclude that the debt represented by the Confessed Judgment Note is dischargeable. Therefore, the Court need not to determine whether the Plaintiff is entitled to damages.

### B. Waiver of Right to Discharge Debt

The parties agree that the Debtor seeks to discharge the Confessed Judgment Note she previously promised to satisfy in full (*see* Pl.'s Ex. 2, Confessed Judgment Note dated March 13, 2008) by filing a bankruptcy petition. Compl. ¶ 2; Answer ¶ 2; Tr. at 6. Unfortunately, the parties' recollections regarding the negotiations surrounding this term of the Confessed Judgment Note are not as reconcilable. Ms. Wilson testified that the Debtor repeatedly promised she had no intention of discharging the debt through bankruptcy and that the Debtor affirmatively waived her right to discharge this debt when she signed the note. Compl. ¶ 25; Tr. at 6, 58, 60-61, 78. The Debtor disagreed with these assertions by maintaining she did not understand the full extent of the rights she was waiving under the Confessed Judgment Note (Tr. at 99-102, 150),[34] including the contract's prohibition against discharging the debt through bankruptcy. *Id.* at 150. After multiple attorneys reassured the Debtor she could still utilize the bankruptcy process to discharge this debt (*see id.* at 146, 150-51), she filed her petition on February 9, 2015. Compl. ¶ 21; Tr. at 77, 129-30; Pl.'s Ex. 21, Debtor's Voluntary Petition for Bankruptcy filed February 9, 2015.

The provisions of the Confessed Judgment Note that are at issue state:

---

[34] The Debtor later testified that by signing the Confessed Judgment Note, she realized that she agreed to all of its' contractual terms. *See* Tr. at 99, 127.

> The [Debtor] hereby warrants her intention to satisfy this Note in full and (i) waives homestead exemption, (ii) waives presentment, demand, protest and notice of every kind respecting this note, (iii) agrees that [Mrs. McCoy], at any time or times, without notice to or the consent of them or any of them, may grant extensions of time, without limit as to the number or the aggregate period of such extensions, for the payment of any principal or interest due hereon, and (iv) to the extent not prohibited by law, waives the benefit of any law or rule of law intended for release or discharge from liability hereon, in whole or in part, on account of any fact or circumstances other than full and complete payment of all amounts due hereunder.
>
> . . . .
>
> THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.

Pl.'s Ex. 2, Confessed Judgment Note dated March 13, 2008.

While these provisions do not accelerate the balance owed by the Debtor upon her filing of a bankruptcy petition so as to constitute a traditional *ipso facto* clause,[35] if the above provision operated as intended, it would have the same effect as an *ipso facto* clause: punishing a debtor for filing bankruptcy. As such, the enforcement of this provision would undoubtedly impede a debtor's ability to receive a fresh start through bankruptcy.

It is well established that courts will not enforce illegal promises made between parties. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) ("'In such cases [where a party seeks to enforce an illegal promise] the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties.'") (quoting *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262 (1909)). Before the Bankruptcy Code was adopted in 1978, courts commonly enforced

---

[35] An *ipso facto* clause is a contractual provision that causes a debtor to immediately default under the terms of a contract upon filing for bankruptcy protection. *DaimlerChrysler Fin. Servs. Ams., LLC v. Jones* (*In re Jones*), 591 F.3d 308, 312 (4th Cir. 2010).

*ipso facto* clauses. *In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012) (citing *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*), No. 92 CIV 7054, 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993)). However, as Judge Buckwalter explains, the promulgation of the Bankruptcy Code rendered *ipso facto* clauses unenforceable as a matter of law. *See id.* (recognizing that '"contract provisions . . . alter[ing] the rights or obligations of a debtor as a result of the debtor's commencement of a case under the Bankruptcy Code'" are unenforceable) (alteration in original) (quoting *In re Chateaugay Corp.*, 1993 WL 159969, at *5) (citing *Lehman Bros. Special Fin. v. BNY Corp. Tr. Servs. Ltd.* (*In re Lehman Bros. Holdings, Inc.*), 422 B.R. 407, 414-15 (Bankr. S.D.N.Y. 2010); *EBC I, Inc. v. Am. Online, Inc.* (*In re EBC I, Inc.*), 356 B.R. 631, 640 (Bankr. D. Del. 2006); *In re Hutchins*, 99 B.R. 56, 57 (Bankr. D. Colo. 1989); *Gen. Motors Acceptance Corp. v. Rose* (*In re Rose*), 21 B.R. 272, 276-77 (Bankr. D.N.J. 1982)).

Sections 541(c) and 365(e)(1) of the Bankruptcy Code are generally viewed as the roots of the Code's moratorium against *ipso facto* clauses. *Id.* at 152-53; *see also In re Chateaugay Corp.*, 1993 WL 159969, at *5. Section 541(c) prohibits the operation of contractual provisions that would deprive a debtor of property and instead mandates that the debtor's interest in such property becomes part of the bankruptcy estate. *In re W.R. Grace & Co.*, 475 B.R. at 153; *see also In re EBC I, Inc.*, 356 B.R. at 640. Similarly, § 365(e)(1) invalidates clauses in executory contracts and unexpired leases that deem a party's commencement of a bankruptcy action to constitute a default. *In re W.R. Grace & Co.*, 475 B.R. at 153.

Courts have also prohibited *ipso facto* clauses based upon more general grounds. *See Riggs Nat'l Bank of Washington, D.C., v. Perry* (*In re Perry*), 729 F.2d 982, 984-85 (4th Cir. 1984) (finding that "[t]his Court's enforcement of a default-upon-filing clause would clearly intrude upon th[e] policy" of giving debtors a fresh start and eliminate the protection of the

automatic stay); *In re Rose*, 21 B.R. at 276-77 (finding that the bankruptcy default clause of the contract at issue would not be enforced, even though the contract was non-executory, because it contravened the central purpose of the Bankruptcy Code).

*Ipso facto* clauses are inconsistent not only with the text of the Bankruptcy Code but also with the Code's intent and central purpose—to provide debtors with a "fresh start." *In re Rose*, 21 B.R. at 277; *see also DiCello v. United States* (*In re Ry. Reorganization Estate, Inc.*), 133 B.R. 578, 582-83 (Bankr. D. Del. 1991) (citing *Century Bank at Broadway v. Peacock* (*In re Peacock*), 87 B.R. 657, 659 (Bankr. D. Colo. 1988)). Moreover, the legislative history of § 365(e) supports a prohibition against the enforcement of clauses that "hamper rehabilitation efforts" in bankruptcy. *In re W.R. Grace & Co.*, 475 B.R. at 154 (citing H.R. REP. NO. 95-959, 95th Cong. 348-49 1st Sess. (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6304; SEN. REP. NO. 95-989, 95th Cong., 59 2d Sess. (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5845). The legislative history behind the Bankruptcy Code has been interpreted as "indicat[ing] that bankruptcy-default clauses are to be invalid in all types of contracts, without limitation . . . . The only Congressional statement is clear that in most, if not all, instances, such clauses are not enforceable." *In re Rose*, 21 B.R. at 276; *see also In re W.R. Grace & Co.*, 475 B.R. at 153-54; *In re Ry. Reorganization Estate, Inc.*, 133 B.R. at 583; *In re Horton*, 15 B.R. 403, 405 (Bankr. E.D. Va. 1981).

As Congressional intent and judicial precedent reveals, the principle of ensuring that a debtor receives a fresh start is strongly rooted in public policy. Numerous courts, drawing on the foundations restricting the use of the *ipso facto* clause, have also refused to enforce prepetition waivers of discharge or agreements in which a debtor waives his right to discharge a particular debt through bankruptcy. *See Lichtenstein v. Barbanel*, 161 F. App'x. 461, 467-68 (6th Cir.

2005) ("[W]aiving a debtor's right to obtain a discharge of a specific debt in a future bankruptcy case is void because it offends the public policy of promoting a fresh start for individual debtors."); *Bank of China v. Huang* (*In re Huang*), 275 F.3d 1173, 1177 (9th Cir. 2002); *Klingman v. Levinson*, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987) ("For public policy reasons, a debtor may not contract away the right to a discharge in bankruptcy."); *Fallick v. Kehr* (*In re Fallick*), 369 F.2d 899, 904 (2d Cir. 1966) ("[A]n advance agreement to waive the benefits of the [Bankruptcy] Act would be void."); *In re Weitzen*, 3 F. Supp. 698, 698 (S.D.N.Y. 1933); *Lewis v. Long* (*In re Long*), 504 B.R. 424, 438 (Bankr. W.D. Va. 2014); *Saler v. Saler* (*In re Saler*), 205 B.R. 737, 744-45 (Bankr. E.D. Pa. 1997); *In re Catron*, 186 B.R. 194, 196 (Bankr. E.D. Va. 1995); *Markizer v. Economopoulous* (*In re Markizer*), 66 B.R. 1014, 1018 (Bankr. S.D. Fla. 1986) ("An agreement to waive the benefit of a discharge in bankruptcy is wholly void, as against public policy."); *First Ga. Bank v. Halpern* (*In re Halpern*), 50 B.R. 260, 262 (Bankr. N.D. Ga. 1985), *aff'd*, 810 F.2d 1061 (11th Cir. 1987) ("Policy considerations dictate that dischargeability questions cannot be predetermined either by a state court or by agreement of the parties prior to or in anticipation of the possible filing of a bankruptcy case."); *Bisbach v. Bisbach* (*In re Bisbach*), 36 B.R. 350, 352 (Bankr. W.D. Wis. 1984).

Enforcing these agreements would render the protections of the Bankruptcy Code obsolete. As the Ninth Circuit Court of Appeals points out, prepetition waivers of discharge must not be enforced because "otherwise, astute creditors would routinely require the debtors to waive" their ability to discharge the debt at issue. *In re Huang*, 275 F.3d at 1177 (citing *Hayhoe v. Cole* (*In re Cole*), 226 B.R. 647, 651-54 (B.A.P. 9th Cir. 1998)); *see also P.B. Surf, Ltd. v. Savage* (*In re Savage*), Adv. No. 14-00061, 2015 WL 4498910, at *5 (N.D. Ala. July 23, 2015) ("[P]repetition stipulations to waive discharge, if allowed, would eviscerate the protections of the

Bankruptcy Code. If it were that easy to avoid a discharge in bankruptcy, every creditor would insert a clause waiving discharge into every contract, promissory note, and lease.") (alteration in original) (quoting *Infinity Grp., LLC v. Lucas* (*In re Lucas*), 477 B.R. 236, 246 (Bankr. M.D. Ala. 2012)). Thus, "[p]re-bankruptcy waivers [are] held to be unenforceable as being in conflict with the purposes of" the Bankruptcy Code. *Watrous v. George* (*In re George*), 15 B.R. 247, 248-49 (Bankr. N.D. Ohio 1981).

Moreover, the statutory framework of the Bankruptcy Code does not recognize prepetition waivers for individual debts. *In re Cole*, 226 B.R. at 653. All debts are presumed to be dischargeable in bankruptcy, unless the debt satisfies one of the exceptions enumerated in the Code. *In re Levinson*, 831 F.2d at 1296 n.3 (citing *Murphy & Robinson Inv. Co. v. Cross* (*In re Cross*), 666 F.2d 873, (5th Cir. Unit B 1982)). Sections 523(a) lists the exceptions to dischargeability of debt but does not include "debts that the debtor has agreed prepetition not to be discharged in bankruptcy." *In re Cole*, 226 B.R. at 653; *Double v. Cole* (*In re Cole*), 428 B.R. 747, 753 (Bankr. N.D. Ohio 2009). Court approval of such agreements may be viewed as an impermissible enlargement of the permissible reaffirmation or discharge waiver remedies available to creditors through the Bankruptcy Code. *See Wank v. Gordon* (*In re Wank*), 505 B.R. 878, 887 (B.A.P. 9th Cir. 2014). "If bankruptcy courts enforced pre-petition waivers of discharge, they would effectively be creating an exception to discharge that Congress had not enumerated." *In re Cole*, 226 B.R. at 653; *see also In re Cole*, 428 B.R. at 753; *In re Catron*, 186 B.R. at 196 ("In order to waive the discharge of a particular debt, the debt must be reaffirmed pursuant to 11 U.S.C. § 524 regardless of any agreement to except the debt from discharge. A contrary holding would be in direct conflict with the intent of Congress to give debtors a fresh start.") (citing *Doug Howle's Paces Ferry Dodge, Inc. v. Ethridge* (*In re Ethridge*), 80 B.R. 581,

585-86 (Bankr. M.D. Ga. 1987)). These holdings reinforce the mandate that exceptions to discharge are to be strictly construed. *Klingman v. Levinson* (*In re Levinson*), 58 B.R. 831, 837 (Bankr. N.D. Ill. 1986), *aff'd*, 831 F.2d 1292 (7th Cir. 1987) (citing *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)); *see also In re Long*, 504 B.R. at 438.

Indeed, Congress provided only three possible ways in which a debtor may waive his right to discharge a debt, through § 727(a)(10), § 524(c), or § 1141(d)(4). *In re Cole*, 428 B.R. at 753; *In re Catron*, 186 B.R. at 196 n.1. Section 727(a)(10) allows debtors to waive their discharge against all debts if the bankruptcy court approves a written postpetition agreement executed by the debtor. 11 U.S.C. § 727(a)(10); *In re Cole*, 428 B.R. at 753. Chapter 11 debtors are afforded the same ability to waive their discharge as to the totality of their debt pursuant to § 1141(d)(4). 11 U.S.C. § 1141(d)(4); *In re Catron*, 186 B.R. at 196 n.1. A debtor may also chose to forego his discharge regarding a specific debt if the debtor complies with the reaffirmation agreement process set forth in § 524(c). 11 U.S.C. § 524(c); *In re Cole*, 428 B.R. at 753; *see also Chilcoat v. Minor* (*In re Minor*), 115 B.R. 690, 693 (D. Colo. 1990); *In re Catron*, 186 B.R. at 196. In any of the three waiver of discharge scenarios contemplated by the Code, the Bankruptcy Court is able to oversee the process and offer protection to a debtor; however, this critical supervision is conspicuously absent when debtors enter into prepetition waivers of discharge. *In re Cole*, 428 B.R. at 753.

The court's oversight of a debtor's decision to waive the discharge of a specific debt is particularly palpable when faced with the multitude of the reaffirmation procedures required by § 524(c). Congressional concern that creditors were placing debtors under undue pressure to reaffirm various debts led to the design of § 524(c) as a safeguard against that pressure and to prevent debtors from "unknowingly waiving their fresh start." *Light v. Adkins* (*In re Adkins*), 151

44

B.R. 458, 461-62 (Bankr. M.D. Tenn. 1992) (citing *Royal Bank of Can. v. Hunt* (*In re Hunt*), 124 B.R. 200, 208 (Bankr. N.D. Tex. 1991); *see also In re Long*, 504 B.R. at 438 (citing *In re Minor*, 115 B.R. at 694). Thus, "[s]uch a carefully crafted structure cannot be overridden by a 'boilerplate' clause inserted into a prepetition agreement." *In re Adkins*, 151 B.R. at 462.

The public policy considerations against the enforcement of pre-petition waivers of discharge are particularly relevant to this case. The Debtor signed the Confessed Judgment Note, which had been drafted by Ms. Wilson, without the assistance of counsel. Tr. at 52-58, 99, 127. When the Debtor entered into the Confessed Judgment Note, she may not have understood the ramifications of her decision or that she was agreeing not to discharge this debt through bankruptcy later, as she testified. *See* Tr. at 99-102, 150.

This Court concurs with the above precedent and finds that the Bankruptcy Code's statutory framework, overarching purpose, and legislative history forbid the enforcement of both *ipso facto* and prepetition waiver of discharge clauses that penalize debtors for filing bankruptcy and intrude on the Code's policy to provide debtors a fresh start through the bankruptcy process. "To provide otherwise will give rise to the birth of the bankruptcy clause as a tool or weapon against those who file bankruptcy." *In re Horton*, 15 B.R. at 405. Thus, the Court finds the provisions in the Confessed Judgment Note that attempt to prohibit the Debtor from discharging this debt through bankruptcy to be unenforceable.

## Summary

The Court is not without empathy for the Plaintiff. From the evidence presented at the trial, Mrs. McCoy appeared to be a remarkable woman who embodied the virtues of generosity and familial loyalty but perhaps some of her family were less than she deserved. Despite the understandable frustration exhibited by Ms. Wilson, as representative of the Plaintiff, regarding

the Debtor's failure to fulfill the Confessed Judgment Note and her disturbing pattern of fiscally irresponsible (if not selfish) behavior preceding the formation of the contract, there is no basis on the record before the Court to find the debt to be nondischargeable either under § 523(a)(2) or § 523(a)(6). For the aforementioned reasons, the Court concludes that Plaintiff failed to meet the burden of proof pursuant to §§ 523(a)(2) and (a)(6), and the debt represented by the Confessed Judgment Note should be discharged. The Court will issue a separate Order consistent with these findings.

The Clerk is directed to forward a copy of this Memorandum Opinion to Tori Danielle Bramble, counsel for the Plaintiff; Deirdre Jo McCoy, *pro se* Defendant; Steve C. Taylor, counsel for the Debtor; John C. McLemore, the Chapter 7 Trustee; and Kenneth N. Whitehurst, III, Assistant United States Trustee.

Entered in the Eastern District of Virginia on this 11th day of August, 2016.

STEPHEN C. ST. JOHN
Chief United States Bankruptcy Judge

46